UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

ANDRE BOOTH,

                          Plaintiff,                          **MEMORANDUM & ORDER**
                                                              17-CV-2081 (MKB)

              v.


COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

  Plaintiff Andre Booth commenced the above-captioned action pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security

(the "Commissioner") denying his claim for disability insurance benefits ("DIB") under the

Social Security Act (the "SSA").  (Compl., Docket Entry No. 1.)  Plaintiff moves for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that that

the Administrative Law Judge Alan B. Berkowitz (the "ALJ") erred because (1) the

Commissioner did not meet the burden of proof in showing that Plaintiff was capable of other

work activity during the period of March 13, 2013 until June 7, 2016.  (*See generally* Pl. Mot. for

J. on the Pleadings ("Pl. Mot."), Docket Entry No. 14; Pl. Mem. in Supp. of Pl. Mot. ("Pl.

Mem."), Docket Entry No. 15.)  Specifically, Plaintiff argues that the ALJ (1) failed to properly

evaluate the medical evidence of record from the treating physicians, (2) failed to properly

consider the effects of Plaintiff's impairments pursuant to the rulings and regulations of the SSA,

and (3) failed to properly assess Plaintiff's allegations of pain pursuant to the rulings and

regulations of the SSA.  (*See generally* Pl. Mem.)  The Commissioner cross-moves for judgment

on the pleadings, arguing that the decision of the ALJ is supported by substantial evidence and should be affirmed. (Comm'r Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 16; Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 17.) For the reasons discussed below, the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case for further proceedings consistent with this Memorandum and Order.

## I. Background

Plaintiff was born in 1966 and was fifty years old at the time of the hearing before the ALJ. (Certified Admin. Record ("R.") 137–38, Docket Entry No. 19.) Plaintiff indicated in his disability report that he completed the eleventh grade but testified at the hearing that he only completed schooling through the tenth grade. (R. 38, 191.) On October 2, 2014, Plaintiff applied for DIB, stating that he has been disabled as of March 13, 2013, due to left knee pain, left ankle pain, lower back pain, and depression. (R. 190.) On April 27, 2015, the Social Security Administration issued a decision denying Plaintiff's application. (R. 96–99.) Plaintiff subsequently requested a hearing before an administrative law judge, (R. 104), which occurred on October 14, 2016, (R. 105–11). By decision dated December 29, 2016, the ALJ found that Plaintiff was not disabled from his alleged onset date of March 13, 2013 through June 7, 2016, but that Plaintiff was disabled on a later onset date of June 8, 2016, his fiftieth birthday. (R. 20.) Plaintiff requested review of the ALJ's decision by the Appeals Council regarding the period of March 13, 2013 through June 7, 2016. (R. 14–15.) By letter dated March 17, 2017, the Appeals Council denied Plaintiff's request for review, making the Commissioner's decision final. (R. 1–6.) Plaintiff filed a timely appeal with the Court. (Compl.)

### a. Hearing before the ALJ

Plaintiff appeared in person at the October 14, 2016 administrative hearing with counsel. (R. 34–57.) During the hearing, the ALJ heard testimony from Plaintiff and a vocational expert. (R. 34.)

### i. Plaintiff's testimony

Plaintiff lives in an apartment in Louisburg, North Carolina. (R. 43.) From 1999 to 2013, Plaintiff worked part-time as a short order cook and a cross-country truck driver. (R. 43–44.) Plaintiff stopped working after he was injured in a car accident in which he "fell through [a] tractor trailer floor." (R. 44.) He did not receive worker's compensation, but he did receive a settlement for $39,000. (R. 44.) He used the money he received from the settlement for his medical treatment. (R. 45.)

Plaintiff experiences pain and discomfort in his knee, ankle, shoulder, neck, and lower back. (R. 43, 46.) He takes several prescription medications for his pain, including, Cyclobenzaprine, Flexeril, Tramadol, Gabapentin, and Meloxicam, however, his prescribed medications do not completely relieve his pain. (R. 42.) Some of Plaintiff's medications make him drowsy. (R. 49.) Plaintiff also receives epidural and cortisone shots. (R. 42.) He last received an epidural shot three weeks prior to the hearing with the ALJ. (R. 47.)

Plaintiff has difficulty sitting and can only sit for approximately one to two hours total, and can only sit for fifteen to twenty minutes before he experiences pain and needs to change his positioning. (R. 47–48, 52.) He can stand for "maybe an hour, hour and a half," but can only stand for fifteen to twenty minutes before he experiences pain. (R. 47, 49.) When Plaintiff does experience pain, he generally applies heat to the affected area with his portable electric pain management device. (R. 53.) Plaintiff walks with the assistance of a prescribed cane. (R. 50.)

He can walk approximately a block and a half before he experiences pain. (R. 49.) He does not experience any pain or difficulty with his hands. (R. 48.) When Plaintiff experiences pain it impacts his ability to focus and concentrate. (R. 49.) At home, his son does most of the housework. (R. 48.) Plaintiff's son also drives him when he needs to travel. (R. 44.)

### ii. Vocational expert testimony

A vocational expert[1] (the "VE"), testified at the hearing after reviewing Plaintiff's work history and listening to Plaintiff's testimony. (R. 54–58.) The VE classified Plaintiff's work as a short order cook as medium exertional level with a specific vocational preparation ("SVP") of three. (R. 55.) The VE also classified Plaintiff's work as a truck driver as medium exertional level with an SVP of four, medium. (R. 55.)

The ALJ asked the VE whether a hypothetical individual that could perform "sedentary work" limited in their "ability to sit for [thirty] minutes at a time, followed by a two-minute reposition break; occasionally bending, stooping, crouching, crawling, kneeling, squatting, climbing; no more than occasional exposure to humidity," could perform any of Plaintiff's past relevant work (the "Hypothetical Individual"). (R. 55.) The VE responded "[n]o, Your Honor." (R. 55.) The ALJ also asked if the Hypothetical Individual, limited to those restrictions, would be able to perform other jobs, and the VE responded "yes." (R. 55–56.) The VE found that the Hypothetical Individual could work as an addresser, stuffed animal stuffer, and an eyeglass frame polisher. (R. 56.) Because there were only 685 jobs as a stuffed animal stuffer in the national economy, the ALJ asked the VE if there were any additional jobs available for the Hypothetical Individual, and the VE responded that there are "only three jobs in the country that

---

[1] The Record does not indicate the name of the vocational expert. (R. 54.)

exist," and then clarified that there were other jobs available with lower numbers of availability. (R. 57.)

The ALJ then asked the VE whether there were any jobs available for the Hypothetical Individual if they were only "on task [eighty] percent of the day, because of pain and medications side effects," and the VE responded "[n]o, Your Honor." (R. 57.)

The ALJ then asked the VE whether there were any jobs available for the Hypothetical Individual if the individual was absent from work for three days per month, and the VE responded no.[2] (R. 57.)

### b. Medical evidence

#### i. Nassau University Medical Center

On December 1, 2012, Plaintiff presented to Nassau University Medical Center ("NUMC") after tripping and getting his foot stuck in a hole. (R. 283.) Plaintiff sustained injuries to his neck and leg. (R. 283.) A clinical impression of Plaintiff's injuries revealed that he had a cervical sprain and sprained left knee. (R. 283.)

On December 5, 2014, Plaintiff presented to the emergency department of NUMC after a motor vehicle accident. (R. 419.) Plaintiff was discharged the same day and advised to continue taking all of his prescription medications. (R. 419.)

#### ii. Dr. Jerome Caiati

On February 21, 2013, prior to Plaintiff's car accident referenced above, Dr. Jerome Caiati, a medical consultant for the Commissioner, conducted a consultative internal medicine

---

[2] Plaintiff's attorney also inquired whether there were any jobs available in the national economy for an individual who could only sit for one hour and stand and walk for one hour, and the VE responded no. (R. 58.) The ALJ agreed and responded, "I could've answered that, actually." (R. 54.)

examination of Plaintiff in connection with Plaintiff's prior claim for DIB.[3]  (R. 268.)  During

the examination, Plaintiff reported that he was able to cook, clean, do laundry, shower, and dress

himself.  (R. 268.)  He did not indicate whether or not he could go shopping or take care of his

children.  (R. 268.)  Dr. Caiati noted that with respect to Plaintiff's gait, he had a "minimum limp

with the right," and he complained of right foreleg pain.  (R. 269.)  Plaintiff also walked on his

heels and toes with minimal difficulty.  (R. 269.)  He could squat, but needed to hold the table

for assistance.  (R. 269.)  Plaintiff used no assistive devices and did not need assistance changing

for the examination or getting on and off the examination table.  (R. 269.)  An examination of

Plaintiff's skin, head, face, eyes, ears, nose, throat, and neck were unremarkable.  (R. 269.)  An

examination of Plaintiff's chest, lungs, heart, and abdomen were also unremarkable.  (R. 269.)

Plaintiff had full range of motion with respect to his shoulders, elbows, forearms, and wrists

bilaterally.  (R. 269.)  He also had full range of motion in his hips, knees, and ankles.  (R. 269.)

Plaintiff reported that flexing created pain.  (R. 269.)  Dr. Caiati reported that Plaintiff's sitting,

reaching, pushing, pulling, and bending were unrestricted.  (R. 266.)  Plaintiff also had

unrestricted standing, walking, and climbing, with minimal limitations due to his right foreleg

pain.  (R. 266.)  Lastly, Dr. Caiati found that Plaintiff had minimum to mild limitations in lifting

due to pain and right foreleg pain.  (R. 266.)

On April 2, 2015, Dr. Caiati evaluated Plaintiff a second time.  (R. 222.)  Plaintiff's chief

complaints were his left shoulder pain, lower back pain, and left knee pain.  (R. 222.)  Dr. Caiati

noted that Plaintiff's diagnoses were unclear and indicated that Plaintiff had no hospitalizations.

(R. 222.)  He noted that Plaintiff was prescribed Tramadol, Meloxicam, Gabapentin, and

---

[3]  Plaintiff made a prior claim for DIB that was denied on March 15, 2013.  (R. 187.)
Plaintiff did not appeal the denial.  (R. 187.)

Cyclobenzaprine. (R. 222.) Plaintiff reported that he could cook, but could not clean or do laundry due to his back and knee pain. (R. 222.) Plaintiff could shower, bathe, and dress himself, but reported that he did not go shopping because he did not enjoy it. (R. 222.) Dr. Caiati noted that Plaintiff had no acute distress and his gait was normal. (R. 223.) Plaintiff could walk on his heels without difficulty, walk on his toes with minimal difficulty, and he complained of left knee pain. (R. 223.) Dr. Caiati also noted that "she uses a back brace and left knee brace, she says for pain, all the time. They were prescribed by her doctor."[4] (R. 223.) Dr. Caiati concluded that Plaintiff's "sitting, standing, and walking [were] unrestricted," and that his "reaching[,] pushing, and pulling [were] unrestricted with the right arm, [however he had] minimal limitation in his left arm with left shoulder pain." (R. 225.) He also concluded that Plaintiff's bending was unrestricted and noted that Plaintiff had a minimal limitation in climbing due to his left knee pain. (R. 223.) Plaintiff also had a minimal limitation in lifting due a mild limitation in his left shoulder and left knee pain. (R. 225.)

### iii. Dr. Lev Aminov

On February 21, 2013, Dr. Lev Aminov conducted a physical therapy re-evaluation of Plaintiff. (R. 264.) In providing Plaintiff's medical history, Dr. Aminov noted that Plaintiff stated that he was injured as a truck driver as he was "putting his equipment back in the truck," and "accidentally [stepped] into [a] hole inside [a] truck, trapping his left foot, falling backwards, injuring his low[er] back, left knee, and left ankle." (R. 235.) Dr. Aminov further noted that Plaintiff reported to NUMC where he was treated for his injuries and went to see a chiropractor, but that he could not continue his treatment due to a lack of medical coverage. (R. 239.) After

---

[4] The Court notes that Dr. Caiati refers to Plaintiff as "she" and "her" in his notes and also mentions a back brace which is not mentioned anywhere else in the record. (R. 223.)

examining Plaintiff, Dr. Aminov reported no injury to Plaintiff's upper extremities and lower extremities.  (R. 239.)  Dr. Aminov also reported that a palpation of Plaintiff's lower extremities revealed local tenderness and swelling over his left knee, left ankle, and left foot.  (R. 239.)  A palpation of Plaintiff's thoracolumbar spine revealed tenderness and spasticity over Plaintiff's paraspinal muscles bilaterally.  (R. 240.)  Plaintiff also had trigger points upon Dr. Aminov's palpation.  (R. 240.)  Plaintiff's lower back flexion extension was forty degrees.  (R. 240.)   Dr. Aminov noted that Plaintiff had subjective complaints of pain, stiffness, difficulty of movement, and swelling with respect to his knees, ankles, and lower back.  (R. 264.)  With respect to Dr. Aminov's objective findings, he found that Plaintiff had a muscle spasm, tightness, tenderness, and "knee buckling."  (R. 264.)  Dr. Aminov noted that Plaintiff had a limitation of motion in "the affected areas," but no muscle weakness.  (R. 264.)  Plaintiff had no significant swelling, but he did walk with his cane and exhibited an antalgic gait.  (R. 264.)  Dr. Aminov diagnosed Plaintiff with lumbar sacral radiculopathy, derangement of the left knee, derangement of the left ankle, and derangement of the left foot.  (R. 236.)  Dr. Aminov noted that in his "professional opinion, [Plaintiff's] symptoms are causally related to the work-related accident of 11/30/12." (R. 240.)  He also noted that Plaintiff "is currently totally disabled."  (R. 236.)

Dr. Aminov referred Plaintiff for Magnetic Resonance Imaging ("MRI") of Plaintiff's lumbar spine which was conducted on May 2, 2014 by Dr. Mark Novick.  (R. 313.)  The findings with respect to Plaintiff's bones and alignment were unremarkable.  (R. 313.)  Plaintiff's L5-S1, specifically the intervertebral disc, was "narrowed posteriorly and ha[d] diminished signal," there was also "bulging of the annulus fibrosus with mild bilateral facet hypertrophy," and "mild central spine stenosis."  (R. 313.)  Plaintiff also had "moderate discogenic stenosis of the bilateral L5 foramina."  (R. 313.)  Plaintiff's "other four lumbar discs and the two lower thoracic

discs [were] normal." (R. 313.)

Plaintiff again sought treatment from Dr. Aminov on June 2, 2014. (R. 241.) Plaintiff was not in acute distress. (R. 237.) Plaintiff was alert and well-oriented, but looked depressed. (R. 241.) Palpation of Plaintiff's upper extremities did not reveal any tenderness swelling, or erythema, (R. 241), however, palpation of his lower extremities revealed local tenderness and swelling over his left knee, left ankle, and left foot, (R. 241). Plaintiff's range of motion in his left knee flexion was ninety degrees and his extension thirty degrees. (R. 241.) His range of motion in his left ankle dorsiflexion was ten degrees, plantar flexion twenty degrees, inversion fifteen degrees, and eversion ten degrees. (R. 241.) Examinations of Plaintiff's cervical spine were unremarkable, however a palpation of Plaintiff's thoracolumbar spine revealed "tenderness and spasticity over paraspinal muscles bilaterally." (R. 241.) There were also trigger points upon Dr. Aminov's palpation. (R. 241.) Plaintiff's muscle strength was decreased over his left foot flexor, his reflexes were decreased over his left knee, and his sensation was decreased to "pin, prick, light touch over L-5-S1 dermatones on the left." (R. 241.) Plaintiff's gait was antalgic, and Dr. Aminov noted that he was limping on his left limb. (R. 241.) Dr. Aminov also noted that an MRI of Plaintiff's left knee revealed a slightly "thickened and edematous anterior cruciate ligaments," which were in "normal anatomoic position," which Dr. Aminov believed to be an ACL sprain or partial tearing of his posterior fibers due to tibial plateau insertion. (R. 241.) Plaintiff had very small joint effusion, and "thickened medial patellar plica." (R. 241.) Dr. Aminov also included notes from an MRI taken of Plaintiff's left ankle which revealed that Plaintiff had a "slight tibiotalar joint effusion, though no apparent tear of the collateral ligame[n]ts [above] the left ankle." (R. 241.) Plaintiff's diagnoses remained unchanged, and Dr. Aminov once again noted that Plaintiff "is currently totally disabled." (R. 242.)

On June 19, 2014, Dr. Aminov conducted a physical capacity test using data "to compare [Plaintiff's] lift strength to published norms." (R. 254.) Plaintiff ability to lift his arms, leg, and with his torso were below the tenth percentile for his gender. (R. 254.) Dr. Aminov noted that Plaintiff's complaints were consistent with his history of injuries and consistent with his objective findings. (R. 255.) He also noted that Plaintiff could not return to work due to persistent pain in his lower back radiating to his lower left leg. (R. 254.)

On August 6, 2014, Plaintiff again sought care from Dr. Aminov. (R. 300.) An examination of Plaintiff's upper extremities and cervical spine were unremarkable. (R. 300.) Plaintiff's lower extremities had no injury upon Dr. Aminov's examination, however, a palpation revealed local tenderness and swelling over the left knee, left ankle, and left foot. (R. 300.) A palpation of Plaintiff's thoracolumbar spine revealed tenderness and spasticity over Plaintiff's paraspinal muscles bilaterally. (R. 300.) Plaintiff's reflexes and sensation were decreased. (R. 300.) His coordination was normal, however, Dr. Aminov noted that Plaintiff's gait was antalgic, and that Plaintiff was limping on his left limb using a cane. (R. 300.) Dr. Aminov encouraged physical therapy, rehabilitation three times a week with hydrocollator packs, electrical muscle stimulation, therapeutic massages, range of motion exercises, an ultrasound, as well as an exercising program for home use. (R. 301.) Plaintiff's prognosis was guarded and Dr. Aminov again noted that Plaintiff "is currently totally disabled." (R. 297.)

### iv. Dr. Maxim Tyorkin

Dr. Aminov referred Plaintiff to Dr. Maxim Tyorkin, an orthopedist, who evaluated Plaintiff on June 12, 2014. (R. 243–44.) Plaintiff's pain scale was an eight out of ten and he complained of pain to his left knee and left ankle. (R. 243.) Dr. Tyorkin noted that Plaintiff had an antalgic gait. (R. 243.) With respect to Plaintiff's left knee, Dr. Tyorkin noted that Plaintiff

had positive effusion and tenderness at his joint line.  (R. 243.)  He also noted that all four of Plaintiff's extremities were sensitive to light touch.  (R. 243.)  Plaintiff's left ankle had no visible joint swelling, however, Plaintiff had tibiotalar effusion in his left ankle.  (R. 244.)  Dr. Tyorkin also noted that Plaintiff had muscle pain, cramps, and joint pain stiffness.  (R. 243.)  Dr. Tyorkin diagnosed Plaintiff with an ankle sprain and internal derangement of the knee.  (R. 244.)  Dr. Tyorkin recommended physical therapy, orthotics, steroid injections, surgery, and activity modification.  (R. 244.)  He noted that Plaintiff's work status was disabled and his prognosis was guarded.  (R. 244.)

### v. **Dr. Nizrali Visram**

On January 9, 2015, Plaintiff presented to Dr. Nizrali Visram at Sports Medicine & Spine Rehabilitation following a motor vehicle accident on December 15, 2014.  (R. 330.)  Plaintiff reported to Dr. Visram that he was in a collision with another vehicle and "[o]n impact he was thrown forward and banged his head against the dashboard."  (R. 330.)  The collision caused Plaintiff to become "dazed, shocked[,] and his vision was not clear."  (R. 330.)  He also reported that he had a sore neck and mid-back pain and that he was transported to NUMC for X-rays and Computerized Tomography ("CAT")  scans.  (R. 330.)  Plaintiff's X-rays and CAT scans were unremarkable, but he sought physical medicine rehabilitation from Dr. Visram because he continued to have pain in his neck and mid back, as well as headaches.  (R. 330.)  A physical examination of Plaintiff conducted by Dr. Visram revealed that Plaintiff had a "spasm of the left mid trapezius with diffuse tenderness of the left upper trapezius."  (R. 331.)  Plaintiff's flexion of his cervical spine was a thirty out of fifty and his extension was a thirty-five out of sixty.  (R. 330.)  His left rotation of his cervical spine was a forty out of eighty and his right cervical spine rotation was a thirty-two out of eighty.  (R. 331.)  An examination of Plaintiff's left shoulder

revealed active range of motion that was complete, however there "was end range pain position with abduction." (R. 331.) Plaintiff also had a headache and an examination of his thoracic spine reveal a "spasm of the thoracolumbar paravertebral muscles mostly on the left side." (R. 331.) Dr. Visram assessed Plaintiff for "post-traumatic cervical spine sprain and strain with myofascial pains," "raidicular symptoms, post-traumatic thoracic spine sprain and strain with myofascial pains," and a "post-traumatic headache." (R. 331.) Dr. Visram also noted that Plaintiff "remains disabled from his recent motor vehicle accident." (R. 331.)

Plaintiff was evaluated by a physical therapist at Dr. Visram's practice on that same day.[5] (R. 360.) The physical therapist noted that Plaintiff's pain was a seven out of ten. (R. 360.) The physical therapist's subjective findings upon evaluation of Plaintiff included (1) cervical pain, (2) left shoulder pain, and (3) mid-back pain. (R. 360.) Plaintiff reported to the physical therapist that he could independently conduct activities of daily living, but he had difficulty lifting and getting up after lying down. (R. 360.) Plaintiff continued to attend physical therapy after his initial evaluation. (R. 361–99.)

On January 30, 2015, Plaintiff again sought treatment from Dr. Visram. (R. 333.) Plaintiff's chief complaints included (1) neck pain with stiffness, (2) pain radiating into both of the shoulders, and (3) a numbness tingling sensation and weakness of his left upper extremity. (R. 333.) Dr. Visram noted that Plaintiff "still [had] some difficulty elevating [his] left arm above [his] shoulder and pain is felt at the back of [Plaintiff's] left shoulder." (R. 333.) He also noted that Plaintiff was attending physical therapy, which offered some relief, and that Plaintiff was taking Tylenol for his pain. (R. 333.) Dr. Visram conducted a physical examination of

_____

[5] The physical therapist initialed the report "NG" but did not include a full name. (R. 360.)

Plaintiff and found that Plaintiff had a "spasm of cervical thoracic paravertebral muscles with diffuse tenderness of the bilateral upper and left bilateral mid trapezius," and "deep tenderness over the left posterior deltoid," of his left shoulder. (R. 333.) Plaintiff's active range of motion was complete. (R. 333.) A physical examination of his thoracic spine was unremarkable. (R. 334.) Dr. Visram's assessment of Plaintiff remained unchanged from Plaintiff's January 9, 2015 appointment. (R. 334.) Dr. Visram also noted that Plaintiff remained disabled. (R. 334.)

On February 27, 2015, Plaintiff returned to Dr. Visram for a follow-up visit and reported that he was experiencing persistent neck pain that radiated into his left upper extremity with weakness and tingling sensations in his left hand. (R. 335.) Plaintiff also reported having "difficulty elevating [his] left arm above [his] shoulder and he [reported that] he is not able to sleep on [his] left side." (R. 335.) Plaintiff's mid-back pain was "not so bad." (R. 335.) Dr. Visram noted that an MRI of Plaintiff's "cervical spine performed on February 5, 2015 revealed disc herniation . . . with multiple hypertrophic changes of the facet joints with central canal stenosis at the C6/7 levels with increased herniation to the left at C6/7 levels." (R. 335.) Dr. Visram conducted an examination of Plaintiff's cervical spine which revealed that there was a "spasm of [his] cervical thoracic paravertebral muscles mostly on the left side," and that "there was spasm of [his] left mid trapezius." (R. 335.) Plaintiff had tenderness over his left supra clavicur fossa. (R. 335.) With respect to Plaintiff's left shoulder, he had active range of motion and it was complete, however there was tenderness "over the posterior deltoid, supraspinatus muscle." (R. 335.) An examination of Plaintiff's thoracic spine was unremarkable. (R. 335.)

On March 6, 2015, Plaintiff attended a follow-up appointment with Dr. Visram. (R. 279.) Plaintiff complained of lower back pain with "residual pain" across his back that became aggravated with bending, leaning backwards, and lifting heavy weight. (R. 279.) Plaintiff also

complained of constant left knee pain which felt like dull aches that became aggravated when Plaintiff climbed stairs.  (R. 279.)  Dr. Visram noted that Plaintiff's left ankle pain had subsided and an examination of his left ankle was unremarkable.  (R. 279–80.)  An examination of his left knee "revealed active or range of motion [that was] nearly complete with end range pain positive with flexion, extension."  (R. 280.)  Plaintiff's "crepitus was mild positive," and there was scar formation along Plaintiff's proximal, lateral aspect of his leg.  (R. 280.)  An examination of Plaintiff's lumbar spine revealed that his flexion was sixty-five out of ninety and his extension was a twenty-two out of thirty.  (R. 280.)  Plaintiff also had a "spasm of [his] thoracolumbar paravertebral muscles," which produced pain in his hamstring and tightness.  (R. 280.)  There was also "diffuse tenderness of the lower lumbar paravertebral muscles."  (R. 280.)  Dr. Visram assessed Plaintiff for post-traumatic lumbar spine sprain and strain with myofascial pains, post-traumatic left knee contusion, laceration with residual pains, and post-traumatic left ankle sprain and strain.  (R. 280.)

On May 20, 2015, Plaintiff met with Dr. Visram for a cervical epidural steroid injection because conservative treatment had failed to alleviate Plaintiff's "persistent neck pain with radicular symptoms."  (R. 346.)  Plaintiff "tolerated the procedure very well," exhibited "stable vital signs throughout the procedure," and was discharged after a short stay.  (R. 346.)

### vi.  Dr. Barry M. Katzman

Upon referral from Dr. Visram, Plaintiff sought treatment from Dr. Barry M. Katzman on April 15, 2015.  (R. 405.)  Dr. Katzman, an orthopedic surgeon, examined Plaintiff due to injuries Plaintiff sustained to his left shoulder during his car accident.  (R. 405.)  Dr. Katzman noted that Plaintiff had left shoulder pain, but opined that Plaintiff's pain originated from his neck although he had pain by the scapula with abduction.  (R. 405.)  Dr. Katzman noted that

Plaintiff had an MRI of his left shoulder that showed some subscapularis tendinopathy. (R. 406.) Plaintiff had a forward flexion of ninety degrees and Dr. Katzman noted that a flexion of 180 degrees was normal. (R. 406.) Plaintiff had no tenderness to palpation over his rotator cuff, biceps, or AC joint. (R. 406.) Plaintiff's "external rotation strength with [his] arm at [his] side [was] equal to the other side," and "Neer and Hawkins impingement signs caused [Plaintiff] some pain by the scapula." (R. 406.) To help Dr. Katzman determine whether Plaintiff had neck and or shoulder pain, Dr. Katzman administered an injection into Plaintiff's left shoulder. (R. 406.)

Plaintiff returned to Dr. Katzman on February 3, 2016. (R. 407.) Plaintiff continued to have shoulder pain and Dr. Katzman noted that the injection he administered did not help. (R. 407.) Plaintiff's forward flexion was a 120 out of the normal range of 180. (R. 407.) There was no tenderness to palpation over his rotator cuff, biceps, or AC joint. (R. 407.) Dr. Katzman again noted that "Neer and Hawkins impingement signs cause[d] some pain by [Plaintiff's] scapula." (R. 407.) Dr. Katzman diagnosed him with "cervical radiculopathy versus left should problem." (R. 408.)

### vii. Dr. Jennifer Schoenfeld

On April 30, 2015, Plaintiff met with Dr. Schoenfeld for a "physiatry follow[-]up." (R. 349–51.) Plaintiff complained of neck pain which radiated pain to his left upper extremity and caused tingling in left hand. (R. 349.) He also complained of left shoulder pain, which he indicated had gotten better since receiving a steroid injection from Dr. Katzman. (R. 349.) Dr. Schoenfeld noted that Plaintiff attended physical therapy two times a week and participated in a home exercise program. (R. 349.) Dr. Schoenfeld found that Plaintiff walked with a normal, reciprocating, non-antalgic gait. (R. 349.) A musculoskeletal examination of Plaintiff revealed

"tenderness to palpation over [Plaintiff's] cervical paraspinal musculature;" Dr. Schoenfeld also

noted diffuse spasms. (R. 349.) Plaintiff had active range of motion of his left shoulder,

however there was "tenderness to palpation over [his] anterior aspect of the shoulder." (R. 349.)

Sensation was diminished in his left hand. (R. 349.) Dr. Schoenfeld assessed Plaintiff with

cervical spine disc herniation with a disc bulge, left C6 radiculopathy, and left shoulder rotator

cuff tendinosis. (R. 349.) Dr. Schoenfeld recommended continued physical therapy, electoral

stimulation, [and] massage therapy. (R. 349.) Lastly, Dr. Schoenfeld noted that Plaintiff was

unemployed and that she advised him to be mindful and careful of his injuries. (R. 350.)

### viii. Dr. Joseph Gregorace

On September 10, 2015, Plaintiff met with Dr. Joseph Gregorace, a pain management

specialist, for a pain management and rehabilitation re-evaluation. (R. 358–59.) Plaintiff

complained of neck pain with stiffness and spasms and pain traveling in his left arm and left

shoulder. (R. 358.) Plaintiff reported that he took Motrin for pain, but could not recall what

other medications he took for his pain. (R. 358.) Dr. Gregorace conducted a physical

examination of Plaintiff and noted that he had weakness in his left elbow, left wrist extension,

left wrist flexion. (R. 358.) All of Plaintiff's remaining neurologic examinations were

unremarkable. (R. 358.) Plaintiff also had spasms throughout his cervical spine. (R. 358.)

Plaintiff's flexion, extension, right rotation, left rotation, right side bending, and left side bending

were all lower than "normal."[6] (R. 358.) Plaintiff also had tenderness along his left shoulder

---

[6] Dr. Gregorace prepared a chart comparing Plaintiff's range of motion and a normal person's range of motion; Plaintiff's flexion was thirty degrees and the normal flexion was fifty degrees; Plaintiff's extension was forty degrees and the normal extension was sixty degrees; Plaintiff's right rotation was fifty-five degrees and the normal right rotation was eighty degrees; Plaintiff's left rotation was fifty degrees and the normal left rotation was eighty degrees; Plaintiff's right side bending was forty degrees and a normal right side bending was fifty

posterolaterally.  (R. 358.)  Dr. Gregorace diagnosed Plaintiff with "Left C6 radiculopathy, HNP C2/3, C3/4, C4/5, C6/7, C7/T1," and "Left shoulder strain/impingement syndrome."  (R. 359.)

Plaintiff had follow-up appointments with Dr. Gregorace on November 23, 2015, (R. 424–25), and January 7, 2016, (R. 426–27).  During both appointments, Plaintiff reported neck and left shoulder pain.  (R. 424, 426.)  Dr. Gregorace conducted a physical examination of Plaintiff and during both appointments found that Plaintiff had spasms throughout his cervical spine.  (R. 424, 426.)  Plaintiff's sensation was intact throughout.  (R. 425, 426.)  Plaintiff's diagnoses remained unchanged from his September 10, 2015 appointment with Dr. Gregorace, (R. 421, 427), however during Plaintiff's January 7, 2016 appointment, Dr. Gregorace concluded that Plaintiff also had left shoulder rotator cuff tendonitis, (R. 427).

On February 18, 2016, Plaintiff again met with Dr. Gregorace with complaints of neck stiffness and pain as well as left shoulder pain.  (R. 428.)  Plaintiff ambulated with a normal "reciprocating, not-antalgic gait."  (R. 428.)  His deep tendon reflexes were two plus.  (R. 428.)  Dr. Gregorace found that Plaintiff's left shoulder had tenderness posterolaterally.  (R. 428.)  Dr. Gregorace noted that it was his "medical opinion that rehabilitation medicine treatment up until this time had great impact on improving [Plaintiff's] overall neck and left shoulder pain and minimizing his spinal and left shoulder impairments."  (R. 425.)

On September 19, 2016, Dr. Gregorace completed a medical source statement on behalf of Plaintiff.  (R. 430–37.)  Dr. Gregorace noted that he first began treating Plaintiff on March 6, 2015 and his last examination of Plaintiff was on September 7, 2016.  (R. 430.)  He diagnosed Plaintiff with chronic neck pain, chronic lower back pain, and left ankle pain.  (R. 430.)  His

---

degrees; Plaintiff's left side bending was forty-two degrees and the normal left side bending was fifty degrees.  (R. 358.)

prognosis was grounded. (R. 430.) Dr. Gregorace noted that Plaintiff's symptoms and functional limitations were reasonably consistent with Plaintiff's physical impairments described in the medical source statement. (R. 431.) He noted that Plaintiff's pain was constant and daily, and that Plaintiff experienced pain primarily in the lumbar spine and left ankle. (R. 431.) Dr. Gregorace also indicated that Plaintiff's pain was precipitated by sitting, standing, and walking. (R. 432.) Dr. Gregorace rated Plaintiff's pain as a seven out of ten and noted that Plaintiff did not suffer from fatigue. (R. 432.) Dr. Gregorace indicated that he had not been able to relieve Plaintiff's pain with medication without unacceptable side effects. (R. 432.) He also opined that Plaintiff could sit and stand for approximately zero to one hours out of an eight-hour work day and recommended that Plaintiff not sit continuously in a work setting. (R. 432.) Specifically, Dr. Gregorace noted that Plaintiff should get up and move approximately every thirty minutes. (R. 432.) With respect to lifting, Dr. Gregorace noted that Plaintiff could occasionally lift or carry less than twenty pounds and never lift or carry more than twenty pounds. (R. 433.) Plaintiff had no limitations in grasping, turning, twisting, reaching, handling, or fingering. (R. 433.) Dr. Gregorace opined that Plaintiff's symptoms could increase if placed in a competitive work environment. (R. 434.) He also opined that Plaintiff's pain and symptoms would periodically impact Plaintiff's attention and concentration. (R. 435.) Dr. Gregorace indicated that Plaintiff would need to take a break every two hours for approximately five to ten minutes, (R. 435), and that Plaintiff would likely be absent from work more than three times a month, (R. 436). When asked in his "best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies," Dr. Gregorace noted that it was his opinion that Plaintiff's symptoms and limitations applied as early as November 30, 2012, when he injured himself while working. (R. 436.) Lastly, Dr. Gregorace noted that Plaintiff needed to

avoid humidity, kneeling, bending, and stooping.  (R. 432.)

### c.  The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the SSA.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 13, 2013.  (R. 26.)  Second, the ALJ found that Plaintiff had the severe impairments of "degenerative disc disease of the cervical, thoracic and lumbar spine[,] and degenerative joint disease of the left shoulder."  (R. 26.)  The ALJ declined to find that Plaintiff's left ankle impairment was a severe impairment because there was no evidence that Plaintiff's left ankle impairment "results in more than minimal work-related physical limitations." (R. 26.)

Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meet or were equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations.  (R. 28.)

Next, the ALJ determined that since March 13, 2014, Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, with the specification that he "can sit for [thirty] minutes at one time with a [two]-minute break before sitting again; occasionally stoop (bend), kneel, crouch, crawl[,] and climb and he can occasionally be exposed to humidity."  (R. 28.)  In making Plaintiff's RFC finding, the ALJ reviewed objective medical evidence and opinion evidence in the record.  (R. 28)

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully supported," for the reasons explained in the ALJ's decision.  (R. 31.)

With respect to the medical source statement completed by Dr. Gregorace, the ALJ

assigned it "some weight" as "emanating from a longtime treating specialist," but assigned it "little weight" because Dr. Gregorace's "opinion regarding sitting 0-1 hour and stand/walking 0-1 hour during an entire 8-hour workday," was inconsistent with Plaintiff's testimony that he could stand for "1 ½ hour at one time and sit for 2 hours at one time." (R. 29.)

The ALJ also assigned "little weight," to the opinions of Dr. Caiati as Dr. Caiati's opinions were "not consistent with other opinions in the record and with the record as a whole, which show greater limitations." (R. 29.)

The ALJ assigned "little weight" to Dr. Aminov's opinion of "total disability" because Dr. Aminov's opinion is "reserved to the Commissioner of Social Security pursuant to Social Security Ruling (SSR) 96-5p." (R. 30.) The ALJ noted that although records showed that Plaintiff complained of intermittent neck pain in April of 2015, prior to that "there was very little evidence of treatment for neck pain." (R. 30.) The ALJ also discussed Dr. Visram's treatment of Plaintiff from March of 2015 through January of 2016 for lower back pain, aggravated with bending, leaning backwards, and lifting weight. (R. 30.) The ALJ did not discuss whether or not he assigned any weight to the opinion of Dr. Visram. (R. 30.) Similarly, the ALJ did not discuss whether or not he assigned any weight to the opinion of Dr. Katzman, but noted that Dr. Katzman treated Plaintiff for shoulder pain in April of 2015 and that "there was little or no evidence of any treatment for back, knee or shoulder pain from March 13, 2013, the alleged onset date, to April [of] 2014." (R. 30.)

At step four, the ALJ found that, based on Plaintiff's RFC, since March 13, 2013, Plaintiff has been unable to perform any past relevant work. (R. 31.) At step five, the ALJ found that "prior to June 8, 2016, a finding of 'not disabled' . . . [was] appropriate," but noted that "beginning on June 8, 2016," Plaintiff's age category changed and that Plaintiff "became

disabled on that date and has continued to be disabled through the date" of the ALJ's decision, with disability reasonably expected to last twelve months.  (R. 32.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d

Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

DIB are available to individuals who are "disabled" within the meaning of the SSA.[7]  To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner has promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the

---

[7]  DIB are available to individuals who became disabled while meeting the insurance status requirements of the SSA.  42 U.S.C. §§ 423(a)(1)(A), 423(c).  The only issue before the Court is whether Plaintiff is disabled.

fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."[8] *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2)[9]; *see*

---

[8] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502). A "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902.

[9] On January 18, 2017, the SSA published a final rule that changed the protocol for evaluating medical opinion evidence. *See* Revisions to Rules Regarding the Evaluation of

*Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) ("At both steps, the ALJ must give good reason in its notice of determination or decision for the weight it gives the treating source's medical opinion." (alterations, citation, and internal quotation marks omitted)); *Halloran*, 362 F.3d at 32. "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96. "If the Commissioner has not otherwise

---

Medical Opinion Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). The "new regulations apply only to claims filed on or after March 27, 2017." *Smith v. Comm'r*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018). Because Plaintiff's claim was filed prior to that date, the Court refers to versions of the regulations that were in effect prior to March 27, 2017. *See White v. Comm'r*, No. 17-CV-4524, 2018 WL 4783974, at *4 (E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27, 2017, the [c]ourt reviews the ALJ's decision under the earlier regulations because the [p]laintiff's application was filed before the new regulations went into effect." (citation omitted)).

provided good reasons for its weight assignment," the district court is unable to conclude that the procedural error is harmless, and remand is therefore appropriate, so that the ALJ can "comprehensively set forth its reasons." *Id.* (alterations, citation, and internal quotation marks omitted); *see also Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (noting that failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand"); *Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion."). However, if a "searching review of the record" assures the court that the "substance of the treating physician rule was not traversed," the court will affirm. *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

### i. The ALJ erred by failing to properly evaluate the opinion of Dr. Gregorace

Plaintiff argues that the "ALJ failed to specify the amount of weight he afforded to Dr. Gregorace." (Pl. Mem. 18.) Plaintiff acknowledges the ALJ assigned the opinion of Dr. Gregorace some weight because Dr. Gregorace was a long-time treating specialist, and that the ALJ gave Dr. Gregorace's opinion "little weight" with respect to Plaintiff's sitting and standing abilities, but argues that the ALJ "simply identified his own opinion about Dr. Gregorace's treating source statement, rather than affording any actual evidentiary 'weight' to it." (*Id*. at 18–19.) More specifically, Plaintiff argues that the "ALJ failed to give Dr. Gregorace's entire opinion the weight that it should have been afforded." (*Id*. at 19.)

The Commissioner argues that "the ALJ reasonably concluded that Dr. Gregorace's opinion was not fully supported by the record and therefore reasonably declined to assign the opinion controlling weight." (Comm'r Mem. 20.)

In finding that Plaintiff was not disabled prior to June 8, 2016, the ALJ did not properly

weigh the opinion of Plaintiff's treating physician, Dr. Gregorace. The ALJ assigned Dr. Gregorace "some weight," given his treating relationship with Plaintiff, but assigned "little weight" to his opinion regarding Plaintiff's ability to sit, stand, and walk. (R. 29.)

Based on guidance from the Second Circuit, this Court has previously held that "when a physician's opinion is not contradicted by another medical opinion, there 'must be overwhelmingly compelling evidence in order to overcome it.'" *Vlado v. Berryhill*, No. 16-CV-794, 2017 WL 1194348, at *10–11 (E.D.N.Y. Mar. 29, 2017) (first quoting *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009); and then citing *Wilson v. Colvin*, No. 15-CV-06377, 2016 WL 5661973, at *3 (W.D.N.Y. Oct. 3, 2016); and then citing *Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254, 2014 WL 1599944, at *10 (E.D.N.Y. Apr. 21, 2014)); *see also Gavazzi v. Berryhill*, 687 F. App'x 98, 100 (2d Cir. 2017) (finding that in discounting portions of a treating physician's opinion, the ALJ "did not cite any contrary medical opinion," and remanding because "on the basis of the record" and "[w]ithout input from additional medical practitioners, neither a reviewing judge nor the Commissioner, could conclude that [the treating physician's] treatment notes, or any part of the record, contained information that justified the decision to discount these parts of [the treating physician's] opinions" (alteration, citation, and internal quotation marks omitted)).

For the reasons explained below, the Court is not persuaded that the evidence cited by the ALJ is "overwhelmingly compelling," and concludes that the ALJ has therefore failed to provide good reasons for dispensing with the conclusions of Plaintiff's treating physician regarding Plaintiff's limitations with sitting, standing, and walking.

### 1. Dr. Gregorace's medical source statement is consistent with Plaintiff's testimony

The ALJ only assigned Dr. Gregorace's opinion little weight "regarding sitting 0-1 hour [and] stand[ing]/walking 0-1 hour during an entire 8-hour workday," because Plaintiff "testified at the hearing that he can stand for [one and a half] hour[s] at one time and sit for [two] hours at one time." (R. 29.)

Contrary to the ALJ's opinion, Plaintiff's testimony regarding his ability to sit, stand, and walk is consistent with the opinion of Dr. Gregorace, and the ALJ did not accurately characterize Plaintiff's testimony. Although the ALJ stated that Plaintiff testified that he could sit for two hours, Plaintiff testified that he could sit for "maybe an hour *or* two," (R. 43), which is consistent with Dr. Gregorace's opinion that Plaintiff could sit for one hour or less during an eight-hour work day. Further, Plaintiff did not definitively state that he could stand for an hour and a half, Plaintiff testified that he could stand for "maybe an hour, hour and a half." (R. 43.) While an ALJ is permitted to resolve conflicts in the evidentiary record, an ALJ is not permitted to pick and choose portions of Plaintiff's testimony that supports his conclusion. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims.").

Even assuming that the ALJ accurately summarized Plaintiff's testimony, the Court finds that an hour difference between Plaintiff's opinion regarding his ability to sit and stand and his treating physician's opinion, is not the type of overwhelmingly compelling critique that would permit the Commissioner to overcome an otherwise valid medical opinion. Further, at the hearing, Plaintiff's attorney was able to ask Plaintiff clarifying questions regarding his ability to sit and stand. (R. 48.) Specifically, Plaintiff clarified that he could sit and stand for about fifteen

to twenty minutes before he experienced pain, (R. 48), and noted that his testimony with respect to standing one to one and a half hours and sitting for one to two hours, was with respect to how long he could sit and stand while tolerating pain. In contrast, the medical source statement completed by Dr. Gregorace did not distinguish between how long Plaintiff could stand and sit in total, and how long he could engage in these activities with or without pain. Plaintiff also testified that he could walk "maybe a block and a half," before experiencing pain, (R. 49), but did not specify the length of time he could walk. Based on the foregoing, the Court finds that the ALJ improperly assigned limited weight to Dr. Gregorace's opinion regarding Plaintiff's ability to sit, stand, and walk.

### 2. Dr. Gregorace's medical source statement is consistent with other objective evidence in the record

Although the ALJ did not provide any other grounds for assigning limited weight to the opinion of Dr. Gregorace, the Court finds that Dr. Gregorace's opinion with regard to Plaintiff's ability to sit, stand, and walk is also consistent with other medical evidence in the record.

Several of Plaintiff's treating physicians noted limitations with Plaintiff's legs, ankle, and knee, which would all arguably impact Plaintiff's ability to sit, stand, and walk. As early as February 21, 2013, Dr. Aminov noted that Plaintiff's lower extremities, specifically his left knee, left ankle, and left foot, revealed local tenderness and swelling. (R. 239.) During that same appointment, Dr. Aminov noted that Plaintiff had a limitation of motion in his affect areas, and that he had antalgic gait and walked with a cane. (R. 264.) On June 2, 2014, Dr. Aminov noted that Plaintiff's gait remained antalgic and that he was limping on his left leg. (R. 241.) During the same appointment, Dr. Aminov noted that Plaintiff's range of motion in his left knee flexion was ninety degrees and his extension thirty degrees. (R. 241.) His range of motion in his left ankle dorsiflexion was ten degrees, plantar flexion twenty degrees, inversion fifteen degrees, and

eversion ten degrees. (R. 241.) Dr. Tyorkin, an orthopedist, also noted deficits in Plaintiff's knee, ankle, and leg. (R. 243.) During an appointment on June 12, 2014, Plaintiff's pain scale was an eight out of ten and Plaintiff complained of pain to his left knee and left ankle. (R. 243.) Dr. Tyorkin noted that Plaintiff had an antalgic gait and noted that Plaintiff had positive effusion and tenderness at his joint line of knee. (R. 243.) He also noted that all four of Plaintiff's extremities were sensitive to light touch. (R. 243.) Dr. Tyorkin also noted that Plaintiff had muscle pain, cramps, and joint pain stiffness. (R. 243.) These treatment notes from Plaintiff's treating physicians all support Dr. Gregorace's finding that Plaintiff was severely limited in his ability to sit, stand, and walk.

### ii. The ALJ's error was not harmless

The ALJ's error in discounting the opinion of Dr. Gregorace was not harmless. In discounting his opinion, the ALJ found that Plaintiff could perform sedentary work. (R. 28.) In addition, the ALJ noted that Plaintiff could sit for thirty minutes at one time with a two-minute break before sitting again and only "occasionally stoop, kneel, crouch, crawl, and climb." (R. 28.) The ALJ did not account for any limitations with respect to standing and walking. The ALJ's RFC determination is inconsistent with the opinion of Dr. Gregorace, therefore, the ALJ's error is not harmless and is grounds for remand.[10]

---

[10] Because the Court remands this action for further administrative proceedings due to the ALJ incorrectly weighing the opinion evidence, the Court declines to address Plaintiff's remaining arguments. However, the Court briefly notes that the ALJ's conclusions with respect to Plaintiff's left ankle and left knee are not supported by substantial evidence.

At the second step of the sequential analysis, the ALJ must determine whether the plaintiff has a severe impairment that significantly limits the plaintiff's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.920(c). The plaintiff bears the burden to provide medical evidence demonstrating the severity of her condition. *See Maxwell v. Berryhill*, No. 15-CV-00585, 2017 WL 9516813, at *3 (W.D.N.Y. July 19, 2017), *report and recommendation adopted*, 2017 WL 4985506 (W.D.N.Y. Nov. 2, 2017); *see also* 20 C.F.R.

§ 416.912(a).  Although the Second Circuit has held that the second step is limited to "screen[ing] out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe," *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995). Where an ALJ excludes certain impairments from the list of severe impairments at the second step, any such error is harmless if the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during subsequent steps.  *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding any error by ALJ in excluding knee injury as a severe impairment was harmless because ALJ identified other severe impairments and considered knee injury in subsequent steps (citing 42 U.S.C. § 423(d)(2)(B))).  However, where an ALJ's decision to exclude an impairment from the list of severe impairments is not supported by substantial evidence, and the ALJ fails to account for any functional limitations associated with the omitted impairments in determining the claimant's RFC, a court must remand for further administrative proceedings.  *See Parker-Grose v. Astrue*, 462 F. App'x 16, 17 (2d Cir. 2012) ("[The claimant's] case must be remanded for further administrative proceedings, because the ALJ's finding that [the claimant's] 'medically determinable mental impairment of depression is nonsevere,' is not supported by substantial evidence and the Commissioner failed to account for any functional limitations associated with [the claimant's] depression when determining her residual functional capacity . . . .").

The ALJ did not find that Plaintiff's ankle and knee impairments were severe impairments although they were repeatedly discussed by Plaintiff's treating physician and Dr. Caiati, the consultative medical examiner.  *See generally* R. 223, 239, 241, 243, 244, 264, 279 300.  The ALJ's omission of these impairments is not supported by substantial evidence. Further, although the ALJ stated that Plaintiff could occasionally stoop, kneel, crouch, crawl, and climb, (R. 28), the ALJ did not account for potential limitations in walking and standing that may have been caused by Plaintiff's ankle and knee impairments, which is also ground for remand. *See Parker-Grose*, 462 F. App'x at 17.

### III. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the
pleadings and denies the Commissioner's motion for judgment on the pleadings. The Court
vacates the Commissioner's decision and remands this action for further administrative
proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is
directed to close this case.

Dated: August 22, 2019
      Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge